DANIEL S. FRANK, and LEOPOLD NEWBORG, FRANK J. G. WEINBERG, HERBERT J. MARX and F. A. MORGAN EASTON, Trading as Newborg & Company,
Complainants Below, Appellants.

*vs.*

WILSON & CO., INC., a Delaware corporation,
Respondent Below, Appellee.

*Supreme Court On Appeal, May 5, 1943.*

LAYTON, C. J., RICHARDS, RODNEY and SPEAKMAN, JJ., sitting.

*William Prickett,* for appellants.

*Aaron Finger,* of the firm of Richards, Layton & Finger, for appellee.

LAYTON, Chief Justice, delivering the opinion of the court:

The suit below was one of several brought by holders of Class A stock of the respondent corporation to protect their rights in such shares against invasion under a plan of recapitalization consummated in 1935. See *Keller, et al., v. Wilson & Co., Inc.,* 21 Del. Ch. 13, 180 A. 584; *Sapperstein v. Wilson & Co.,* 21, Del. Ch. 139, 182 *A.* 18; *Bay Newfoundland Co. v. Wilson & Co.,* 24 Del. Ch. 30, 4 *A.* 2d 668; *Id.,* 24, *Del. Ch.* 288, 11 *A.*2d 278; *Id.,* 26, Del. Ch. 270, 28 *A.*2d 157. The *Keller* and *Sapperstein* suits were brought shortly after the recapitalization plan had been declared operative. The *Bay Newfoundland Company* suit and this suit were brought after this court, reversing the decree of the Chancellor in the *Keller case* (21 *Del. Ch.* 391, 190 *A.* 115), had decided that the amendment to the corporate charter was a nullity as against non-assenting Class A stockholders.

As briefly as possible the facts are these: Daniel S. Frank, one of the complainants below and the real party in

interest, was the owner of 405 shares of the Class A stock of the respondent corporation, registered, however, in the name of Newborg & Company. At or about the end of the year 1934, there were issued and outstanding 227,233 shares of the corporation's 7% cumulative preferred stock, of the par value of $100.00, 313,205 shares of Class A stock of no par value in effect a second preferred stock, entitled to annual cumulative dividends at $5.00 a share, and 434,466 shares of common stock. The bill of complaint was silent as to the arrearages of dividends accumulated on the preferred stock, but, as will appear, there were large arrearages. The complaint alleged that the arrearages of dividends accumulated on the Class A stock amounted to $21.25 a share, a total of $6,656,265.00. The corporation and its subsidiaries had an earned surplus in excess of $8,000,000.00. In these circumstances on December 14, 1934, the corporation's board of directors approved a plan of recapitalization, and called a meeting of the stockholders to be held on February 19, 1935, to take action thereon. Notice of the meeting, to which a copy of the plan was attached, was sent to the stockholders on December 31, 1934. The plan purported to convert the preferred stock with all accumulations of dividends into a no par cumulative preferred stock entitled to annual dividends of $6.00, on the basis of 1.4292 shares of the new stock for each share of the old; to convert the Class A stock with all accumulations of dividends into common stock, on the basis of five shares of common stock for each share of Class A stock; and to increase the number of the common shares. Newborg & Company, acting for its undisclosed client, Frank, instructed the corporation to vote the 405 shares of the Class A stock against the plan and amendment to the corporate charter; and these shares were so voted. The required amendment was approved by a very large vote of the several classes of stock. Only 100 of the preferred shares, 900 of the Class A shares, and 50 of the common shares were voted against the amendment, while 163,945 of the preferred

shares, 209,155 of the Class A shares, and 317,279 of the common shares were voted in favor of it. On February 23, 1935, a certified copy of the amendment to the corporate charter was filed in the office of the Secretary of State. On February 26, 1935, a dividend of $1.50 a share was declared on the new preferred stock, and a dividend of $.125 a share was declared on the common stock, payable on June 1, 1935, to stockholders of record on May 15, 1935. On March 28, 1935, the company wrote Newborg & Company stating that they had not exchanged their Class A certificates for common stock certificates; that a dividend of $.125 a share on the common stock had been declared; and that it would facilitate the receipt of dividends on their shares if the exchange of certificates was made before the date of the payment of the dividend. This letter was not answered. In April, 1935, Frank learned from a newspaper item that one Herman Sapperstein, an attorney at law and an owner of Class A stock, had brought an action in the Court of Chancery against the respondent to establish his rights as owner of such shares; and on April 12, he retained Sapperstein to represent him in connection with the litigation; but no attempt was made by Frank to intervene in the action. On May 22, 1935, Newborg & Company wrote the respondent inquiring whether the dividend payable on June 1 would be paid to the holders of Class A stock, and were told in reply that the old Class A shares would be treated as reclassified under the plan of recapitalization adopted by the stockholders, and the dividend would be paid to common stockholders of record on May 15. In the meantime, on May 24, 1935, the Chancellor, in an action brought by Joseph Keller and another, holders of Class A shares, held that the amendment was legally sufficient to convert the Class A shares into common shares, to destroy the dividend preference incident to those shares as related to the future, and to cancel the preference as it related to the past and accumulated dividends. *Keller, et al., v. Wilson & Co., Inc.*, 21 *Del. Ch.* 13, 180 *A.* 584, *supra.* On June 1, 1935,

the respondent sent to Newborg & Company a check in the sum of $253.13, representing, as stated on the check, a common stock dividend at $.125 a share; and with the check was a notice that while the exchange of certificates had not been made, the company felt that a sufficient time had not elapsed between the meeting of the stockholders on February 23, 1935, and the date of the first dividend payment; that it had been decided to treat all shares as having been converted, and to pay the dividend to all Class A stockholders on the basis of five shares of common stock for each share of Class A stock; and, again, it was suggested that the receipt of dividends would be facilitated by an early exchange of stock. The check and notice were received without demur. Like quarterly dividends were paid on August 31, and December 2, 1935, and were received by Newborg & Company without protest. On December 4, 1935, the bill of complaint filed in the *Sapperstein* suit was dismissed. Sapperstein so advised Frank, and told him that he had not decided whether or not he would take an appeal, and three months later was still undecided. Frank did nothing. Through the year 1936 like dividends were declared and paid on the common stock and were received by Newborg & Company without objection; and they paid no attention to two letters written during the year to them suggesting that they exchange their Class A shares for common shares. In November, 1936, Frank learned through a newspaper item that this court had reversed the decree of the Chancellor in the *Keller* case, and he promptly retained one of the counsel for the complainants in that suit to represent him to take such action by intervention or otherwise as might be necessary to protect his rights. Thereafter, he was told by his attorney that the *Keller* suit was about to be settled, and upon his insistence a formal application to intervene in the suit was made, and denied without prejudice on August 4, 1937. *Keller v. Wilson & Co.,* 22 *Del. Ch.* 175, 194 *A.* 45. During the year 1937, quarterly dividends on the common stock were declared and paid, and

were received by Newborg & Company without objection or protest; and it was not until January 22, 1938, that the complainants filed their bill of complaint. The bill prayed that the amendment be declared to be null and void in so far as it purported to convert the 405 shares of Class A stock into 2025 shares of common stock without first paying the arrearages of dividends accumulated on the Class A stock at the time of the amendment; and a declaratory judgement was sought advising the complainant of the rights to which he was entitled by virtue of his ownership of the unexchanged shares. By an amendment to the bill, it was further prayed that the complainant be relieved from the consequences of his acceptance of dividends declared and paid on common stock as a relievable mistake of law. The respondent demurred, alleging laches, acquiescence and general want of equity. It was stipulated that the complainant, Frank, had full knowledge of the correspondence between Newborg & Company and the respondent corporation, and that the dividend checks were turned over to Frank by Newborg & Company, or were cashed with his knowledge and consent.

Preliminarily it is necessary to consider a motion made by the complainant to strike from the respondent's brief a statement of fact and argument based thereon. In the brief is this statement: "The bill of complaint does not state the amount of accumulated dividends on the 7% Cumulative Preferred stock. However, it appears from the opinion of this court in *Keller, et al., v. Wilson & Co., Inc.,* 21 *Del.Ch.* 391, 190 *A.* 115, 116-117, that on February 1, 1935, 'there were accumulated and unpaid dividends on the preferred stock amounting to $26.25 per share, or a total of $5,965,260 on the outstanding shares' of Preferred Stock." Upon this statement is based the argument that the complainant's case is without equity, or, at least, its equity is beclouded, for the reason that he seeks to gain all the advantages accruing to him from the elimination of those dividends, while, at the same time, he challenges the validity of the amendment; and

the inference is drawn that the complainant delayed bringing his suit until likelihood of attack by an old 7% preferred shareholder had become negligible. The complainant insists that it does not appear in the record that there were any unpaid accumulated dividends on the 7% preferred stock, and this court will not judicially notice proceedings in other causes, even though such proceedings are in the same court. This seems to be the general rule. 1 *Jones Ev., 2nd Ed.,* 767; 15 *R.C.L.* 1114; 23 *C.J.* 113; 31 *C.J.S., Evidence,* § 50; *Murphy v. Citizens' Bank,* 82 *Ark.* 131, 100 *S.W.* 894, 11 *L.R.A.,* (*N.S.*) 616, 12 *Ann.Cas.* 537. The basis of the rule is that the opposing party has no way to meet such evidence, and it becomes conclusive against him, while in fact, it might have been met and overcome if properly introduced. The complainant, however, is in no position to invoke the rule for his benefit for two reasons. First: there is an exception to the rule in a case where the complainant refers to the other proceeding or judgment, and specifically bases his right of action, in whole or in part, on something which appears in the record of the prior cause. In such case, the court, in passing on a demurrer to the complaint, will take judicial notice of the matters appearing in the record in that case without formal proof. *Stewart v. Phoenix Nat. Bank,* 49 *Ariz.* 34, 64 *P.2d* 101; *Cogburn v. Callier,* 213 *Ala.* 38, 104 *So.* 328; *Schneider v. Decker,* 144 *Okl.* 213, 291 *P.* 80. The complainant, in his amended bill, specifically refers to the decision of this court in *Keller* case, and avers his attempt to intervene in the case. He makes use of his application to intervene as proof that he was vigilant in the assertion of his rights as a Class A stockholder, and was not guilty of laches. If he had been allowed to intervene he would have been bound by the facts of the case; and that decision was, undoubtedly, the basis of his action below. In these circumstances, this court will take judicial notice of the fact that when the amendment to the corporate charter was effected there were accumulated and unpaid dividends on the 7% preferred stock amounting to

nearly $6,000,000.00. Second: there is in the record the fact that there were accumulated dividends on the 7% preferred stock. Exhibit B, attached to the complaint, is a copy of the plan of recapitalization submitted to the stockholders, in which the results of the plan were stated. With respect to the 7% cumulative preferred stock there was the statement that those shares would be changed and reclassified into and as shares of $6.00 preferred stock on a certain basis of exchange, so that upon the adoption of the plan "the holders of such shares of 7% preferred stock shall cease to have any rights, preferences, privileges or claims (including any rights or claims of any kind to accumulated dividends on such 7% preferred stock * * *")", and precisely the same language as in the parentheses was used with respect to the Class A stock. It will be noticed that the indefinite and conditional word "any" was used with respect to rights and claims, and not as to accumulated dividends, the existence of which appears with sufficient certainty. The plan itself informed the stockholders that there were accumulations of dividends on the 7% preferred stock. The amount of such dividends was not disclosed, it is true, but the complainant was put on notice that there were such accumulations, and in the assertion of his rights of ownership of stock of subordinate class, he was bound to inquire as to the amount of the accumulations. He is chargeable with such knowledge.

In *Keller, et al., v. Wilson & Co., Inc.*, 21 *Del. Ch.* 391, 190 *A.* 115, we held that the right of a holder of cumulative preferred stock to have paid at some future time the accumulations of dividends thereon was, as between the shareholders, a vested right, having the nature of a debt, postponable in enjoyment until the creation of a fund from which payment could be legally made; that the amendment to the corporate charter, in so far as it assumed to destroy the rights of the complainants to dividends accrued on their Class A stock up to the time the amendment became effective was a nullity; and, consequently, the arrears of the dividends would

have to be paid before any distribution could be made to the holders of common stock. Such matters are of concern to stockholders only; no question of public policy is involved; and it was not held that the amendment was utterly void in any and all circumstances, but only as against non-assenting stockholders. *Trounstine v. Remington Rand, Inc.*, 22 *Del. Ch.* 122, 194 *A.* 95; *Federal United Corp. v. Havender*, 24 *Del. Ch.* 318, 11 *A.* 2d 331. The non-assenting stockholders, therefore, were in a position to assert that it was not within the power of the majority to bind them by the amendment; but, clearly, the corporate action was one which could be subsequently ratified by a stockholder who had at the first not consented to it, or his rights might be lost through his laches.

The remarkable feature of the case before us is that the complainant accepted without protest regular quarterly dividends declared and paid on 2025 shares of common stock for upwards of two years; and much of his brief is devoted to an exposition of his rights to do so without sacrifice of his rights as a Class A shareholder. The Chancellor held that it was not necessary to determine whether his decision was rested on laches or acquiescence; but from all that was said it would seem that the decision was founded on the doctrine of acquiescence. 24 *Del. Ch.* 237, 9 *A.2d* 82. The complainant, earnestly and at length, insists that acquiescence must consist of conduct amounting to consent during the progress of the wrongful act, which was the accomplishment of the amendment. *Duke of Leeds v. Amherst*, 2 *Phil.Ch.* 117, 41 *Eng. Rep.* 886; *Debussche v. Alt.*, *L.R.* 8 *Ch.Div.*286; *Woodruff v. North Bloomfield Gravel Mining Co.*, (*C.C.*) 18 *F.* 753; that his acceptance of dividends thereafter did not constitute acquiescence; that even if acquiescence could be found in his subsequent act in accepting dividends on common stock, the respondent was not misled to its injury, and, therefore, no estoppel was raised against him; and that he was not guilty of laches because his stock was voted against the

amendment, had never been exchanged for common stock, he had retained counsel in the *Sapperstein* suit, and had attempted to intervene in the *Keller* suit.

It is. not necessary to consider whether all of the elements of estoppel by conduct are shown by the record; nor whether the wrongful act, in so far as it affected the complainant's rights as a Class A stockholder, was continuing in character, and if so, whether the acceptance of dividends declared and paid on common stock amounted to acquiescence during the progress of the wrongful act.

In *Federal United Corporation v. Havender*, 24 *Del. Ch.* 318, 11 *A.2d*, 331, we declined to say that an objecting stockholder must, in every case, move to enjoin a proposed corporate action in order to escape the imputation of laches; but we did say that it was incumbent on such stockholder to give notice in plain and unambiguous terms that the intended trespass upon his rights would be contested. It is not necessary here, however, to determine whether the voting of stock against a proposed corporate amendment and the failure to surrender old stock certificates for exchange, without more, constitute that definite and unequivocal action sufficient to repel the charge of laches under the doctrine of the cited case.

The ancient and well established doctrine of equity was that relief would not be granted, defensively or affirmatively, because of a mistake of law unaccompanied by other equitable considerations. The principle is not now of universal application. There are more or less well defined exceptions which are as firmly established as the rule itself, grafted on the law to prevent flagrant injustice and unconscionable advantage. Judicial opinion does not agree as to what these exceptions are or the grounds on which they are based. Mr. Pomeroy, in his work on *Equity Jurisprudence* (*Vol.* 3 § 849a) undertakes to formulate a general rule which has been said to state the law accurately both in this country and in England. *Barnett v. Kunkle*, (8 *Cir.*) 256 *F.* 644. But the learned author prefaced his statement of the rule by saying

that when a person correctly apprehends his own legal rights, interests and relations, a simple mistake as to the legal effect of a transaction into which he enters, in the absence of other determining incidents, is not a ground for relief. The complainant did not pretend to be ignorant or mistaken as to his antecedent and existing legal rights. He insisted from the first that his Class A shares remained unaffected by the amendment, and in this he was ultimately found to be right. There were no other determining incidents. There was no deception or misrepresentation. On the contrary, it was made abundantly clear that the respondent intended to treat the Class A shares as reclassified into common shares, and that the dividends were paid on the shares as reclassified. Failure of the complainant to understand the effect of his acceptance of dividends is not a mistake against which equity will grant relief. *Trounstine v. Remington Rand, Inc.*, 22 *Del. Ch.* 122, 194 *A.* 95.

We come now to the affirmative contention made by the complainant. As stated in his brief, substantially it is this: he had a claim in the nature of a debt against the respondent corporation for a definite and liquidated sum amounting to $21.25 on each of his 405 Class A shares, which awaited only the creation of a fund from which the debt could be legally paid; when a dividend was declared on the common stock the existence of such a fund was necessarily admitted; consequently, he was entitled to accept the dividend checks sent to him from time to time, apply the amounts to the respondent's general indebtedness to him, and disregard the known fact that the payments were offered as dividends on common stock pursuant to the plan of recapitalization.

The fatal weakness of this argument is that it disregards or glosses over the manner in which the so-called fund was created. At the time the amendment became effective the arrearages of dividends accumulated on the preferred stock amounted to nearly $6,000,000.00; and this amount was a first charge on the corporation's surplus and earnings. The

surplus was somewhat in excess of $8,000,000.00. The arrearages of dividends accumulated on the Class A stock were more than $6,000,000.00. If all of the arrears of dividends incident to the preferred stock were paid, only a small part of the arrears incident to the Class A stock could be paid in any event; and it is not reasonable to suppose that the corporation would have devoted any part or all of the remainder of the surplus to that purpose, nor could it have been compelled so to do.

The Class A stockholders could expect no return on their investment in any predictable future, for the prospect of the payment of the arrearages of dividends accumulated on the Class A shares was a mere hope. The recapitalization plan made possible an immediate return on their investment in Class A shares reclassified into common shares five times in number. This was a benefit, not so much, it is true, as five dollars annually, but yet a clear benefit; and the benefit was achieved by the elimination of the dividends accumulated on the preferred stock. There was, in reality, no fund in existence from which the claims of the Class A stockholders could be legally paid. The sacrifice of dividends made by the preferred stockholders was a contribution to the plan of recapitalization, and not to a fund for the benefit of Class A stockholders as such.

As a non-assenting Class A stockholder, the complainant was entitled to insist that no part of the surplus or earnings be devoted to the payment of dividends on common stock until his prior claim had been discharged, and so long as he maintained the integrity of his position it was unassailable; but he could not accept the benefit offered by the plan and at the same time deny its validity. He was put to an election whether to accept the amounts of money sent him from time to time as dividends declared on common stock pursuant to the plan and thereby signify his assent to it, or to reject them and maintain his position in all its strength. With full knowledge of the facts he chose to accept the div-

idends with no objection other than that inferable from the voting of his shares in opposition to the amendment and his failure to exchange them for common shares on the basis of the plan. This was not conduct, inconsistent but reasonably explainable. It was decisive and conclusive conduct; and the complainant must abide the consequences of his own voluntary acts. Whether the complainant was guileless or was deliberately playing with the situation for any bargaining value it might have need not be considered.

The authorities cited by the complainant in support of his right to accept the dividends without sacrifice of his position are not helpful to him. In *Smith v. National Commercial Title & Mortgage Guaranty Co.*, 120 *N.J.L.* 75, 198 *A.* 407, and *Strout v. Cross, &c., Lbr. Co.*, 283 *N.Y.* 406, 28 *N.E.2d* 890, 133 *A.L.R.* 646, the complainants accepted only that which they were entitled to have in any event. Here the complainant took that to which he had no right except for the plan.

The defenses of laches, acquiescence, ratification and estoppel all have some element in common. Acquiescence and ratification are closely related. The terms are oftentimes loosely used. Acquiescence properly speaks of assent by words or conduct during the progress of a transaction, while ratification suggests an assent after the fact. Ratification, moreover, implies a voluntary and positive act; but inaction alone may amount to a positive act. *State v. Benton*, 8 *W.W.Harr.* 1, 20, 187 *A.* 609. Knowledge, actual or imputed, of all material facts is an essential; but ratification may be implied from conduct, as well as expressed by words. Conscious intent is not an element, nor does ratification require a change of position or prejudice. 2 *Pomeroy, Eq.Jur.*, (4th Ed.) § 965; 2 *Fletcher, Corporation*, § 751. Acquiescence may be evidence of ratification, or expressed otherwise, acquiescence may rest on the principle of ratification. *In re Grocers' Baking Co.*, (*D.C.*) 266 *F.* 900, *affirmed* 277 *F.* 1015. Where the conduct of a complainant, subsequent to the trans-

action objected to, is such as reasonably to warrant the conclusion that he has accepted or adopted it, his ratification is implied through his acquiescence. *Pollitz v. Wabash R. Co.,* 207 *N.Y.* 113, 100 *N.E.* 721. When the late Chancellor observed in *Romer v. Porcelain Products, Inc.,* 23 *Del. Ch.* 52, 2 *A.2d* 75, 76, that a complaining stockholder was barred by "the estoppel of his acquiescence", or when it is said that a stockholder cannot attack an *ultra vires* act when he has accepted pecuniary benefits under it with knowledge of the facts, 13 *Fletcher, Corporations,* § 5862, or that acts indicating an acceptance by a stockholder of an amendment to a corporate charter bind him and bar his suit, 2 *Cook, Corporations, (8th Ed.)* 673, it is equivalent to saying that by his conduct the complainant has ratified the matter in dispute.

The complainant insists that Chancellor Wolcott, in denying his application to intervene in the *Keller* suit, 22 *Del. Ch.* 175, 194 *A.* 45, *supra,* clearly invited him to bring an independent action, and in dismissing his petition without prejudice, explicitly recognized that his rights could not be summarily disregarded even though the fact that he had accepted the dividends declared and paid on common stock was before the court. It is sufficient to say that nothing of comfort to the complainant can be found in anything the late Chancellor said. On the contrary, it is clear that the complainant's equity was regarded as of a most doubtful quality.

The complainant, Frank, must be held to have ratified the conversion of his Class A shares into common shares pursuant to the plan of recapitalization by his voluntary and decisive acts with full knowledge of the facts.

The decree of the court below is sustained.